**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 10-cv-61813 –GRAHAM/O'SULLIVAN**

**MICHAEL P. BRANNON, Psy.D., individually, MICHAEL P. BRANNON, Psy.D., P.A., a Florida professional services corporation, and INSTITUTE FOR BEHAVIORAL SCIENCES AND THE LAW, LLC, a Florida limited Liability company,**

**Plaintiffs,**

**v.**

**HOWARD FINKELSTEIN, in his official capacity as Broward County Public Defender,**

**Defendant.**
**_________________________________________/**

**DEFENDANT HOWARD FINKELSTEIN'S MOTION FOR FINAL SUMMARY JUDGMENT OR IN THE ALTERNATIVE, MOTION FOR PARTIAL SUMMARY JUDGMENT**

Comes now Defendant HOWARD FINKELSTEIN, by and through undersigned counsel, and pursuant to Fed. R. Civ. P. 56(a), and hereby serves his Motion for Final Summary Judgment, or in the alternative, Motion for Partial Summary Judgment, and in support thereof, states as follows:

## Introduction

Plaintiffs' entire cause of action, a 42 U.S.C. § 1983 claim for alleged retaliation against first amendment protected speech, in which Plaintiffs allege that they suffered a loss of income based on reduced referrals from the Broward County Public Defender's Office (hereinafter "P.D.") because of said retaliation, cannot stand as a matter of law, as it is undisputed that said

reduction in income corresponds almost exactly with the budget reductions suffered by the P.D. during that same time period. In fact, while it is undisputed that Plaintiffs received fewer actual dollars from the P.D. in the 7-19 months following the protected speech in question which Plaintiffs allege was the source of the purported retaliation, Plaintiffs' percentage of total referrals for expert services from the P.D. actually increased in comparison to the prior year's percentage of work. Accordingly, these undisputed facts show that Plaintiffs have failed to establish the necessary causation between the protected speech in question and Plaintiffs' reduced income from referrals for expert services from the P.D. Because Plaintiffs' argument regarding this necessary prong is fatally flawed, Mr. Finkelstein is entitled to final summary judgment as a matter of law.

In the alternative, Mr. Finkelstein is entitled to partial summary judgment as to all portions of the claim in question pertaining to Mr. Finkelstein's alleged role in the implementation of the Broward County Court's "rotation wheel" for the appointment of experts, as Plaintiffs have put forth no evidence which ties Mr. Finkelstein to same, while the actual person responsible for same, then-Chief Judge Victor Tobin, unequivocally stated that Mr. Finkelstein played no role whatsoever in the implementation of same.

Additionally, Mr. Finkelstein, in his capacity as the Public Defender, is entitled to partial summary judgment pertaining to Plaintiffs' removal from the Broward Public Defender's "rotation wheel" for mental health expert services and for objecting to Dr. Brannon's appointment by the court or retention by the State in cases involving P.D. clients, as undisputed statements made by Dr. Brannon not only justified, but obligated Mr. Finkelstein to protect his clients from being subjected to expert testimony pertaining to said clients from Dr. Brannon, regardless as to who hired Dr. Brannon and regardless as to which of Mr. Finkelstein's Assistant

Public Defenders represented said clients. These actions were clearly taken in Mr. Finkelstein's function as an attorney for criminal defendants as opposed to actions taken under color of state law.

However, if the Court finds that the Plaintiff states a plausible cause of action for First Amendment retaliation and that Mr. Finkelstein's actions were taken under color of state law, he is entitled to qualified immunity as he clearly acted within his discretionary authority when determining it was in the best interest of P.D. clients to object to Dr. Brannon's court appointment or retention by the State Attorney's Office in cases involving P.D. clients.

**Legal Standard**

A party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "A fact is 'material' and precludes the granting of summary judgment if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principles of law to the rights and obligations of the parties." *Black's Law Dictionary* 881 (5th ed. 1979). The burden of establishing that no genuine issue of material fact exists is on the party moving for summary judgment, who must identify the portions of the record which it believes demonstrate the absence of a genuine issue of material fact. Celotex v. Catrett, 477 U.S. 317, 323 (1986).

In response to a properly supported motion for summary judgment, "the adverse party may not rest upon mere allegations or denials of the adverse party's pleadings, but . . . must set forth specific facts which show a genuine issue for trial." Fed. R. Civ. P. 56(e). If the non-moving party fails to "make a sufficient showing on an essential element of her case with respect

to which she has the burden of proof," then the Court must enter summary judgment for the moving party. Celotex, 477 U.S. at 323. If the moving party meets its burden, the non-moving party must show more than "some metaphysical doubt" as to the material facts. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The non-moving party must come forward with specific facts showing a genuine issue for trial. Id. at 587.

## Final Summary Judgment

To establish a cause of action under 42 U.S.C. § 1983 for First Amendment Retaliation, "a plaintiff must show that (1) [the] speech was constitutionally protected; (2) [they] suffered adverse conduct that would likely deter a person of ordinary firmness from engaging in such speech; and (3) there was a causal relationship between the adverse conduct and the protected speech." Castle v. Appalachian Tech. College, 631 F.3d 1194, 1197 (11th Cir. 2011) (citing Bennett v. Hendrix, 423 F.3d 1247, 1250 (11th Cir. 2005)). However, if it can be shown that the "same action [would have been taken] in the absence of the protected conduct . . . the defendant cannot be held liable." Id.

**First Prong—Constitutionally Protected Speech**

In the case at bar, it is undisputed that Dr. Brannon's December, 2007, testimony at the JQC hearing regarding Judge Aleman was protected speech.

**Second Prong—Suffering of Adverse Conduct**

As for the second prong, Plaintiffs have not developed any relevant evidence that they were subjected to "adverse conduct" originating from Mr. Finkelstein. In fact, given the undisputed nature of the P.D.'s budgetary shortfalls, the varying amount of dollars doled out to various mental health experts, including the Plaintiffs, over a number of years from a number of

different budgets (budgets created by entities beyond the control of Mr. Finkelstein) does not display any conduct on the part of Mr. Finkelstein whatsoever.

Plaintiffs' charge that they suffered a reduction in income (actual dollars) derived from less referrals from the P.D., as is alleged repeatedly in Plaintiffs' complaint, is factually irrelevant, as income (actual dollars) and referrals provide no measuring stick whatsoever as to conduct on the part of Mr. Finkelstein, let alone adverse conduct. This is because it is factually undisputed that, due to tremendous budget shortfalls related to Article V legislation, the P.D. suffered drastic reductions in monies which could be spent on expert services such as those provided by the Plaintiffs and their peers. It is further undisputed that the amounts of money available for such services was not determined by the P.D., but rather, by the State Legislature.

In other words, in the relevant time periods complained of by the Plaintiffs, the "pie" of available P.D. monies for expert services such as those provided by the Plaintiffs and their peers shrunk to such a degree, that had Plaintiffs maintained their same level of income and referrals, it would have clearly come at the cost of dramatically reducing the percentage of work given to Plaintiffs' peers or eliminating same altogether. Accordingly, the only relevant measuring stick to determine adverse conduct on the part of Mr. Finkelstein would be to look at the percentage of the "pie" allotted to Plaintiffs, regardless of the size of the pie, a size which was dictated not by the P.D. or Mr. Finkelstein, but by the State Legislature.

However, the Plaintiffs have put forth no evidence legally sufficient to establish alleged adverse conduct on the part of Mr. Finkelstein. In deposition, Dr. Brannon testified to the fact that at various times, he "asked around" or spoke to peers in an effort to gauge Plaintiffs' referrals versus theirs. See Exhibit G, page 134, line 7—page 136, line 5. However, this hearsay

evidence is insufficient to oppose summary judgment. Even if such statements were legally sufficient, such anecdotal evidence would be irrelevant to the total issues at bar.

Therefore, because Plaintiffs have failed to put forth any evidence to show that Mr. Finkelstein subjected them to adverse conduct in light of the undisputed shrinking "pie" of monies and referrals from the P.D. available to the Plaintiffs and their peers (a shrinking that was undisputedly beyond the control of the P.D.), Plaintiffs have failed to meet their burden in opposing summary judgment, and accordingly, Mr. Finkelstein is entitled to summary judgment as a matter of law.

**Third Prong—Causal Relationship**

Despite Plaintiffs' inability to put forth any evidence to establish actual adverse conduct, even if this Court sees fit to examine this third and final prong of the Plaintiffs' cause of action, the true measuring stick, the percentage of total income and referrals from the P.D. that Plaintiffs received regardless of the total amount available, clearly shows that in the 7-19 months subsequent to the protected speech in question, Plaintiffs actually received a greater percentage of the overall "pie" of available monies and referrals than in the 12 month period of time during which the protected speech occurred, an undisputed fact which flies in the face of Plaintiffs' entire claim.

In order to establish a causal connection, a plaintiff must show that the defendant was subjectively motivated to take the adverse action because of the protected speech. Castle at 1197 (*citing* Smith v. Mosley, 532 F.3d 1270, 1278 (11th Cir. 2008)). In Mosley, the Eleventh Circuit affirmed summary judgment for appellees, a warden and an assistant warden, because the court determined that the appellees would have acted in the same manner even if the appellant had not

participated in protected speech. To reach this conclusion, the Mosley court used the "*Mt. Healthy* burden-shifting formula" which establishes that:

> Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on [his motion for judgment as a matter of law or prior to trial on] summary judgment.

Mosley at 1278 (*quoting* Thaddeus-*X*, 175 F.3d, 378 at 399 (6th Cir. 1999); *see generally* Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)). Further, "[u]nder the Mt. Healthy approach, if the government official can prove that [he] would have taken the adverse action in the absence of the plaintiff's protected conduct, [he] cannot be held liable." Id. at n. 22 (*quoting* Thaddeus-X, 175 F.3d at 388 n.4).

In the case at bar, Plaintiffs have put forth no relevant first-hand evidence of the subjective motivation of Mr. Finkelstein as to any action taken related to this matter, allegedly retaliatory or not. The only concrete, first-hand evidence provided by Plaintiffs is their reduction in total amount of dollars received from the P.D., a figure lacking in any relevance given the fact that at the same time Plaintiffs allege a total reduction, the total amount of money available to be paid to Plaintiffs and their expert peers reduced similarly.

As stated above, because of the aforementioned drastic reduction in total dollars available to the P.D. at the relevant time periods, Plaintiffs' use of total dollars cannot function as a measuring stick of Finkelstein's intentions regarding the Plaintiffs. Instead, the accurate measuring stick should be the percentage of work that was provided to the Plaintiffs. Plaintiffs have put forth no evidence at all pertaining to what percentage of the ever-shrinking amount of

monies available to them and their expert peers they received both before the JQC hearing in question and after. Accordingly, Mr. Finkelstein's evidence to same cannot be rebutted.

It is therefore undisputed that in fiscal year 2006-2007, which extended from July, 2006, to June, 2007, the P.D. expended $1,943,544.28 on mental health experts. Of this total amount of the "pie," Plaintiffs received $608,757.50 or 31.32% of the "pie" for the time periods in question. See Exhibit D.

It is further undisputed that in fiscal year 2007-2008, which extended from July, 2007, to June, 2008, the P.D. expended $1,333,635.49 on mental health experts. Of this total amount of the "pie," Plaintiffs received $390,212.00 or 29.26% of "the pie" for the time periods in question. Id. It is within this time period that the alleged protected speech which purported motivated the retaliation in question occurred.

It is further undisputed that in fiscal year 2008-2009, which extended from July, 2008 to June, 2009, a period of time lasting from seven to 19 months after the alleged protected speech which purportedly motivated the retaliation in question, the P.D. expended a mere $562,091.00 on mental health experts. Remarkably, despite the fact that Plaintiffs have alleged "immediate" retaliation (See Plaintiff's First Amended Complaint, paragraph 15) following the December, 2007, protected speech, of this total amount of the pie (now drastically reduced by entities completely outside of the Mr. Finkelstein's control), Plaintiffs received $170,612.00 or 30.35% of same for the time periods in question, and even greater percentage of total work available than in the prior fiscal year. Id.

Accordingly, by using a true, meaningful, relevant measuring stick, it is undisputed that in the seven to 19 months following Dr. Brannon's testimony at the JQC hearing in question, Plaintiffs received a greater share of the total amount of money available for mental health

experts than in the time period of five months prior to the incident in question and seven months following same. Therefore, there can be no dispute that no retaliation occurred much less that "immediate" retaliation occurred as it pertained to the amount of work Plaintiffs received from the P.D., as Plaintiffs allege in their complaint.

A similar set of circumstances occurred in the matter of Farrow v. West, 320 F.3d 1235 (11th Cir. 2003). In Farrow, the plaintiff brought a § 1983 claim for speech retaliation, among other claims, against a nurse in the corrections facility in which the plaintiff was an inmate. The court determined that because the plaintiff did not create the requisite causal connection of First Amendment speech retaliation summary judgment for the defendant was appropriate on this claim. Specifically, because in support of her motion for summary judgment, the defendant produced an affidavit stating she had never received, nor had knowledge of the plaintiff's complaints and the plaintiff offered no evidence to rebut the defendant's evidence. "Thus, summary judgment was proper on Farrow's retaliation claim because Farrow has not established a causal relationship between his complaints and the alleged denial of treatment by Nurse Shipman and her nursing staff." Id. at 1249. S*ee* Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). ("If the party seeking summary judgment meets the initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence.").

The failure by a Plaintiff to come up with relevant evidence of a causal connection between protected speech and alleged adverse treatment is fatal to such a Plaintiff's claim in the face of a Motion for Summary Judgment from the Defendant on said issue. In Martinez v. Minnis, 257 Fed. Appx. 261 (11th Cir. 2007) the Eleventh Circuit upheld the lower court's

decision that summary judgment was appropriate in a §1983 First Amendment retaliation claim because the plaintiff failed to show a causal connection between the protected speech and adverse treatment for failure to submit any "evidence to support his belief that retaliation was the motivation behind the [defendant's actions]. Instead, he merely asserted, without evidentiary support, that these actions were motivated by a retaliatory animus. On this record, the district court did not err by entering summary judgment as to Martinez's properly exhausted claims." Id. at 266.

In the case at bar, all evidence on the record, when taken in the light most favorable to the non-moving party, clearly establishes that Mr. Finkelstein can show the "same action [would have been taken] in the absence of the protected conduct." Castle at 1197. Mr. Finkelstein has presented through his Rule 26 Disclosures, discovery responses, and deposition testimony that the Plaintiffs' loss of income from the Public Defender's Office was not in retaliation to Dr. Brannon's protected speech, and that the loss of income would have occurred to the same degree even if the Dr. Brannon had not testified in the Judge Aleman JQC hearing. As the Plaintiff has presented no evidence to rebut Mr. Finkelstein's evidence, final summary judgment in favor of Mr. Finkelstein is appropriate.

**Partial Summary Judgment as to the Court's Expert Wheel**

Plaintiffs have failed to put forth any credible evidence establishing that Finkelstein, either in his individual capacity or in his capacity as the Public Defender of Broward County, "prevailed upon Chief Judge Victor Tobin to stop allowing criminal court judges to select whichever psychiatrist, psychologist or physician they wished for court appointments…and to require them to select solely from a rotation…" and that Chief Judge Tobin acquiesced to

"Finkelstein's suggestion" for such a rotation, as is alleged in Plaintiff's complaint (D.E. 6 ¶¶ 17-18).

Pursuant to Fed. R. Civ. P. 56(a), a party may move for summary judgment by identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. Courts will consider, and may grant, partial summary judgment when it is determined that the movant has met his or her burden by showing some, but not all, issues are shown to have no material facts at issue. *See generally*, Alaska v. United States, 546 U.S. 413 (2006); IBP, Inc. v. Alvarez, 546 U.S. 21; Norfolk Southern Ry. v. James N. Kirby, Pty Ltd., 543 U.S. 14.

In the case at bar, it is undisputed that Chief Judge Tobin was the sole individual capable of instituting the rotation in question. In addition to Plaintiff's own pleadings, the Administrative Order establishing said rotation was signed by Chief Judge Tobin. See Exhibit P. Plaintiff has neither alleged in a pleading, nor presented any evidence, that anyone other than Chief Judge Tobin could have done so.

It is further undisputed that Chief Judge Tobin not only stated that Finkelstein had nothing to do with the implementation of the Court rotation, he also stated the true intent behind said implementation, which was an effort to avoid potential criticism and to avoid being the only County in the Tri-County area which did not have such a rotation. See Exhibit J, page 11, line 10—page 12, line 22 and page 13, line 24—page 14, line 6. Finkelstein has also clearly denied playing any role whatsoever in the implementation of the Court rotation for experts. See Exhibit B No. 5.

Plaintiff, on the other hand, has presented no evidence to rebut the testimony from the alleged conspirators denying the purported conspiracy to change the way in which the entire

judicial system of Broward County selected experts for the express purpose of causing the Plaintiff financial harm. In fact, despite the aforementioned assertions in his Complaint, Plaintiff admitted in deposition that the primary basis for these allegations was an alleged statement made by an unknown court employee who stated that in the month prior to Chief Judge Tobin's implementation of the Court rotation for the appointment of experts, Finkelstein met with Chief Judge Tobin. See Exhibit G, page 146, lines 14-25 and page 147, lines 1-24. Even assuming this alleged meeting, learned of by Plaintiff via pure hearsay, actually occurred, Plaintiff was unable to put forth any evidence that same had anything to do with the implementation of the Court rotation in question. Id. When pressed in deposition of the existence of any other basis for the aforementioned allegation, Plaintiff disclosed only supposition about a "plan" that lacked any direct evidence whatsoever. Id.

Therefore, because Plaintiffs are unable to present any relevant evidence whatsoever concerning Mr. Finkelstein's alleged role in the Broward County Court's implementation of a rotation wheel for court-appointed experts, Mr. Finkelstein is entitled to no less than partial summary judgment as it contains to all allegations pertaining to this matter.

**Partial Summary Judgment as to Removal of Plaintiffs from P.D. Expert Wheel**

Even if Plaintiffs survive the above-referenced arguments, Mr. Finkelstein is still entitled to partial summary judgment as to any claims of retaliation that extend beyond July 2009, when Dr. Brannon expressed clear displeasure and disagreement with the changes in policies and procedures implemented by the P.D. while testifying in the matter of State of Florida v. Bernard Joseph. See Exhibit M, pages 131-135. At that point in time, any actions taken by the Mr. Finkelstein to ensure that Dr. Brannon could not testify in any way in matters dealing with his clients would clearly be considered legally and ethically required in his representation of his

clients, both individually and through his assistant public defenders, and would not involve any issue of state law. Accordingly, any claims of damage following the aforementioned statements made by Dr. Brannon cannot stand as a matter of law.

42 U.S.C. § 1983 "provides a remedy against 'any person' who, under color of state law, deprives another of rights protected by the Constitution." Collins v. City of Harker Heights, 503 U.S. 115, 120 (1992). At the summary judgment stage, Mr. Finkelstein can show through record evidence and deposition testimony that the decision to no longer retain the Plaintiff as an expert was not made under the color of state law and as such, § 1983 provides no remedy for these actions. The Supreme Court holds "that a person acts under color of state law only when exercising power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." Polk County v. Dodson, 454 U.S. 312, 317-18 (1981) (*quoting* United States v. Classic, 313 U.S. 299, 326 (1941)). In Branti v. Finkel, 445 U.S. 507 (1980), a case in which two assistant public defenders were terminated solely for their political affiliations, the Supreme Court explained the role of the public defender:

> [The] primary office performed by appointed counsel parallels the office of privately retained counsel. Although it is true that appointed counsel serves pursuant to statutory authorization and in furtherance of the federal interest in insuring effective representation of criminal defendants, his duty is not to the public at large, except in that general way. His principal responsibility is to serve the undivided interests of his client. Indeed, an indispensable element of the effective performance of his responsibilities is the ability to act independently of the government and to oppose it in adversary litigation.

Id. at 519 (*quoting* Ferri v. Ackerman, 444 U.S. 193, 204). In Branti, the public defender terminated and appointed assistant public defenders based on their political affiliations. The Branti Court held that the termination on the basis of political affiliation was found to be done

under color of state law because it was not done for the needs of the public defender's clients, but rather pursuant to the public defender's appointment. The Court stated that, "whatever policymaking occurs in the public defender's office must relate to the needs of individual clients and not to any partisan political interests." Id.

The holding in Branti is illustrative in showing that Mr. Finkelstein did not, in fact, act under state law because the record evidence and deposition testimony clearly shows that the decision to no longer retain the Plaintiff as an expert for the Public Defender's Office was a result of the Plaintiff's openly hostile comments against the Public Defender's Office. These comments led Mr. Finkelstein and the chief assistant public defenders to determine that the Plaintiff was biased against the Public Defender's Office of Broward County.

In Polk, an assistant public defender was sued by her client under § 1983 for moving to withdraw as counsel because she determined the client's appeal to be frivolous. The Supreme Court found for the assistant public defender and determined that "a public defender does not act under color of state law when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding." The Court instructed that the complaint *must* be dismissed as it was based on such activities. Polk at 325 (Emphasis added). As the head of the Public Defender's Office, a public law firm, it is the Public Defender's traditional function to ensure that each client is being fairly represented. Branti at 519. Upon perceiving an open and public bias against the Office by the Plaintiff, it was Mr. Finkelstein's obligation to make the best decision for his clients.

Once Dr. Brannon made statements as to his personal displeasure as to the P.D. itself, the Mr. Finkelstein, acting solely as an attorney on behalf of the best interest of his clients, was left with no choice but to take all necessary efforts to preclude Dr. Brannon from testifying in cases

involving those clients. Accordingly, as of July, 2009, any alleged conduct on the part of the Mr. Finkelstein was made purely as an attorney and not under color of state law. Therefore, Mr. Finkelstein is entitled to partial summary judgment as it pertains to any and all claim against him subsequent to July, 2009.

**Qualified Immunity**

The record does not support Plaintiffs' claim for First Amendment retaliation, nor did Mr. Finkelstein engage in any unlawful conduct whatsoever. However, if the Court finds that the Plaintiff states a plausible cause of action for First Amendment retaliation, Mr. Finkelstein is entitled to qualified immunity.[1] Qualified immunity protects state officials from liability in Section 1983 actions as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Lewis v. City of West Palm Beach, 561 F.3d 1288, 1291 (11th Cir. 2009) "To receive qualified immunity, the officer must first show that he acted within his discretionary authority." Id. The applicability of qualified immunity is subject to a two-part test, which asks whether the officer's conduct amounted to a constitutional violation, and whether the right violated was clearly established at the time of the violation. Id.

Mr. Finkelstein clearly acted within his discretionary authority when determining it was in the best interest of P.D. clients to object to Dr. Brannon's court appointment or retention by

[1] The importance of qualified immunity to the efficient functioning of government cannot be overstated, especially in a case such as this where the public defender's office's discretion to make strategic litigation decisions is at stake. For over twenty years, the Supreme Court has explained that qualified immunity strikes a balance between providing redress to individuals for abuses of public office and protecting society against claims that "frequently run against the innocent as well as the guilty[.]" Harlow v. Fitzgerald, 457 U.S. 800, 814, (1982). Society bears the cost of unfounded lawsuits in "the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." Id. There is also the "danger" that "fear of being sued will dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties." Id.

the State Attorney's Office in cases involving P.D. clients. Florida Statute § 27.58 states: "The public defender of each judicial circuit of the state shall be the chief administrator of all public defender services authorized under s. 27.51 within the circuit." First and foremost among the public defender services is the obligation to "represent . . . any person determined to be indigent" and who is charged with a criminal offense. Fla. Stat. § 27.51(1). Thus, Florida law authorizes Mr. Finkelstein to make all litigation decisions with regard to the office's representation of indigent clients, including what expert witnesses to hire and when to object to the Court and the State's use of Dr. Brannon as an expert.

Mr. Finkelstein's actions did not violate clearly established law. As argued fully above, the Plaintiffs have failed to establish that any actions by Mr. Finkelstein constituted a violation of their First Amendment rights. The Plaintiffs' loss of income is the result of strategic decisions made by the Public Defender's Office. It is equally clear that Mr. Finkelstein's alleged actions did not violate clearly established law. Qualified immunity shields discretionary official conduct and prevents lawsuits that do not allege violations of clearly established constitutional law of which a "reasonable person" would have known. Harlow, 457 U.S. at 819. The standard of conduct embodies objective legal reasonableness. So measured, qualified immunity affords "ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1985). To disentitle public officials of qualified immunity, the unlawfulness of their conduct "must be apparent," Anderson v. Creighton, 483 U.S. 635, 640, (1988) and "all reasonable officials would have realized the particular challenged conduct violated the constitutional provision sued on[.]" Pierce, 117 F.3d at 871 (citations omitted). Indeed, if "officers of reasonable competence could disagree on th [e] issue, immunity should be recognized." Malley, 475 U.S. at 341. The law is clearly established only where "it would be

clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001) (emphasis added). *See also*, Maggio v. Sipple, 211 F.3d 1346, 1354 (11th Cir.2000) ("To defeat a defendant's claim to qualified immunity, a plaintiff must show that a reasonable person in the defendant's position would have been on notice that his actions violated clearly-established law.") Because the analysis of First Amendment retaliation claims involves intensely fact-specific legal determinations, "a defendant in a First Amendment suit will only rarely be on notice that his actions are unlawful." Id at 202. The question here is whether a reasonable person similarly situated to Mr. Finkelstein – an elected public defender and criminal defense attorney – would have realized that making strategic litigation decisions regarding the office's representation of its clients, most notably the decision to object to Plaintiff's appointment by the court or retention by the State Attorney's Office in cases involving public defender clients, constitutes a violation of the Plaintiff's First Amendment rights. Predictably, there is no case law in this circuit or elsewhere that would stand for the untenable proposition that Mr. Finkelstein could violate the Plaintiff's First Amendment rights by opposing his use as an expert by the State and the Courts because of his bias towards the Public Defender's Office.

In short, there is no law, let alone clearly established law, that would put Mr. Finkelstein on notice that he could not undertake strategic litigation decisions as the elected Public Defender without violating the Plaintiff's rights under the First Amendment. As such, Mr. Finkelstein is entitled to qualified immunity.

**Injunctive Relief**

Plaintiffs state that Mr. Finkelstein is being sued pursuant to Section 1983 seeking "declaratory and injunctive relief." (D.E. 6, ¶ 1). Plaintiff fails to plead a basis to show he is

entitled to such relief. It is well established that "a plaintiff must demonstrate standing separately for each form of relief sought." Friends of Earth v. Laidlaw Envtl. Serv., 528 U.S. 167, 185 (2000). Plaintiff must also do more than rely on allegations that amount to "labels and conclusions, and a formulaic recitation of the elements of a cause of action." Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). Plaintiff's complaint does not address the four elements necessary for injunctive relief: 1) substantial likelihood of success on the merits; 2) irreparable injury in the absence of an injunction; 3) that Plaintiff's injury outweighs any harm to Defendants; and 4) that an injunction is not adverse to the public interest. *See, e.g.,* Gold Coast Publications, Inc. v. Corrigan, 42 F.3d 1336, 1343 (11th Cir.2004).

Plaintiff alleges Mr. Finkelstein's reprisal against him for his exculpatory testimony in favor of Judge Aleman is causing him irreparable harm, i.e. a violation of his First Amendment right to give truthful testimony. (D.E. 6, ¶ 33). Plaintiff states that "if not enjoined by this Court, Finkelstein will continue to use his office as Public Defender to inhibit Brannon's engagement as a forensic expert. . ." (D.E. 6, ¶ 33). Finally, Plaintiff seeks this Court to enjoin "Finkelstein. . . and anyone working in concert with Finkelstein, from continuing to retaliate against Brannon." Plaintiff completely fails to plead any facts that demonstrate "imminent" future harm to his rights under the First Amendment. In other words, at no time does Plaintiff establish an actual threat to the exercise of his constitutional rights, which he must do to be entitled to injunctive relief. Instead, Plaintiff complains of the Public Defender's office inhibiting "Brannon's engagement as a forensic expert." (D.E. 6, ¶ 34). Plaintiff wholly fails to demonstrate a substantial likelihood of injury to his rights under the first amendment.

In addition, Plaintiff fails to establish that "Plaintiffs' injury" outweighs any harm to Mr. Finkelstein. If this Court were to order Mr. Finkelstein to hire the Plaintiff as its exclusive

expert, and then prohibit Mr. Finkelstein from objecting to the Plaintiff's appointment by the State or the Court during the course of Mr. Finkelstein representation of his clients, his ability to perform his duties as a criminal defense attorney would be impermissibly burdened. The Court simply cannot intrude on the attorney-client relationship and inject itself into Mr. Finkelstein's litigation strategy. Accordingly, it is clear the Plaintiff cannot plead a basis for injunctive relief.

**CONCLUSION**

Because Plaintiffs have failed to present relevant and/or legally sufficient evidence as to a) alleged adverse conduct on the part of Mr. Finkelstein; b) the required causation between the protected speech in question and the alleged adverse conduct; c) any relationship between Mr. Finkelstein and the implementation of the Broward County Court's wheel rotation for expert appointments; and d) Mr. Finkelstein's motivations to preclude Dr. Brannon's testimony in cases involving his clients after July, 2009, other than Dr. Brannon's display of hostility toward the P.D., Mr. Finkelstein is entitled to final summary judgment as a matter of law in his favor, or in the alternative, partial summary judgment as to each of the aforementioned matters. In a nutshell, the numbers do not lie—Plaintiff received a greater percentage of the available P.D. funds for mental health experts as far out as 19 months subsequent to the alleged protected speech. That the total amount of P.D. funds available for mental health experts declined to such a degree over the relevant periods of time has no nexus or connection to the alleged protected speech, yet appears to be the basis of Plaintiffs' entire claim.

However, if the Court finds that the Plaintiff states a plausible cause of action for First Amendment retaliation and that Mr. Finkelstein's actions were taken under color of state law, he is entitled to qualified immunity as he clearly acted within his discretionary authority when

determining it was in the best interest of P.D. clients to object to Dr. Brannon's court appointment or retention by the State Attorney's Office in cases involving P.D. clients.

Respectfully submitted,
s/Alicia Lyons Laufer
Alicia Lyons Laufer, Esq.
Florida Bar No. 414336
alaufer@lauferlawyers.com
LAUFER & LAUFER, PA
2200 NW Corporate Blvd, Suite 404
Boca Raton, FL 33431
Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 27, 2012, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified in the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: s/Alicia Lyons Laufer
Alicia Lyons Laufer
Florida Bar No. 414336

**SERVICE LIST**

**Michael P. Brannon, et al. v. Howard Finkelstein.**
Case 10-cv-61813-Graham/O'Sullivan
United States District Court, Southern District of Florida

William R. Amlong, Esq.
Amlong and Amlong, P.A.
**Counsel for Plaintiffs**
500 Northeast Fourth Street
Second Floor
Fort Lauderdale, Florida 33301-1154
954-462-1983 Telephone
EMAIL:WRAmlong@theAmlongfirm.com
[CM/ECF]