UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case Number: 10-Civ-61813-Graham/O'Sullivan

MICHAEL P. BRANNON, etc., et al.,

      Plaintiffs,

vs.

HOWARD FINKELSTEIN, etc.,

      Defendant.

_____/

### Plaintiffs' Response to Defendant's Howard Finkelstein's Motion for Final Summary Judgment or in the Alternative, Motion for Partial Summary Judgment

      Plaintiffs, Michael P. Brannon, Psy.D.; Michael P. Brannon, Psy.D., P.A.; and the Institute for Behavioral Sciences and the Law, LLC, respond as follows to Defendant's Howard Finkelstein's Motion for Final Summary Judgment or in the Alternative, Motion for Partial Summary Judgment (DE 104) ("Defendant's Motion"):

### Introduction and Summary

      The Broward County Public Defender's Office drastically curtailed the business that it gave to Michael Brannon, Psy.D., a forensic psychologist, once Dr. Brannon testified before the Florida Judicial Qualifications Commission in favor of a circuit judge whom Howard Finkelstein, the elected public defender, considered to be a bad judge.

**The Amlong Firm** ● 500 Northeast Fourth Street ● Fort Lauderdale, FL  33301 ● 954.462.1983

Although Mr. Finkelstein denies that the reduction in the amount of business that his office gave Dr. Brannon was motivated by any retaliation against Dr. Brannon for his testimony:

**One**, Mr. Finkelstein "expressed dissatisfaction over Dave Bogenschutz defending her and Dr. Brannon testifying on her behalf," according to a defense lawyer to whom Mr. Finkelstein spoke shortly after the testimony;

**Two**, Mr. Finkelstein "was surprised, extremely  disappointed," he acknowledged during his deposition testimony, confirming that his conversation with the lawyer took place shortly after the testimony.

**Three**, Dr. Brannon's income from public-defender appointments dropped — beginning immediately after his testimony — from $608,758 in fiscal year 2006-2007, to $390,213 in 2007-2008, to $170,613 in 2008-2009, to $12,800 in 2009-2010, and $0 in 2010-2011.

**Four**, although Mr. Finkelstein assured Dr. Brannon in 2009 that "[y]ou are part of the rotation [for being hired by his assistant public defenders]," he then forwarded the e-mail to his top lieutenant, to whom he quipped when she wrote back, "[a]re you trying to make me ill?":

> no.  him.  death by a 1000 invisible cuts.  withering on the vine, pinned and wriggling on the wall with no target or issue or martyrdom for him to seek sanctuary.

## Plaintiff's Points and Authorities

**<u>Point 1</u>:    Defendant fails to show in its summary-judgment motion what necessary part of plaintiffs' case is missing.**

"The burden of establishing the nonexistence of a 'genuine issue' is on the party moving for summary judgment."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 330 (1986)(citations omitted).  "This burden has two distinct components: an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party."  <u>Id</u>. (Citations omitted.)

"The burden of persuasion imposed on a moving party by Rule 56 is a stringent one....  Summary judgment should not be granted unless it is clear that a trial is unnecessary, … and any doubt as to the existence of a genuine issue for trial should be resolved against the moving party…"  Id. at 331, n. 2 (citations omitted).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.  Federal Rule of Civil Procedure 56(c)(1).  "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed.R.Civ.P. 56(c)(2).  "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant

or declarant is competent to testify on the matters stated." Fed.R.Civ.P. 56(c)(4).

As this Court's predecessor, Hon. Adalberto Jordan, summarized in the

Order on Motions to Dismiss, DE 30:

> To prevail under § 1983, a plaintiff, like Dr. Brannon, must prove that his speech was constitutionally protected, that the retaliatory conduct adversely affects protected speech, and that a causal link exists between the retaliation and the adverse effect.  See Bennett v. Hendrix, 423 F.3d 1247, 1250 (11th Cir. 2005).  It matters not whether the retaliation actually chilled the plaintiff's speech.  What matters is whether the retaliatory act "would deter a person of ordinary firmness from exercising his or her First Amendment rights. See Gattis vs. Bruce, 136 F.3d 724, 726 (11th Cir. 1998).

DE 30, at 5.

In the instant case, defendant Howard Finkelstein acknowledges that

Dr. Brannon's testimony in favor of the late Judge Aleman in December 2007

was protected speech.  Defendant's Motion, at 4.

Yet he denies any causal connection between Dr. Brannon's testimony

— at which Mr. Finkelstein testified that he was "surprised [and] extremely

disappointed," Statement of Facts ("Facts"), at ¶ 52 — notwithstanding

record evidence that:

*One*, Mr. Finkelstein had his "Can you believe…" conversation with

defense lawyer Michael Gottlieb within days of Dr. Brannon's testimony on

behalf of Judge Aleman — a conversation that prompted Mr. Gottlieb to

hurriedly telephone Dr. Brannon to relay to him the gist of his conversation,

which both Dr. Brannon and Mr. Gottlieb testified at deposition left Dr. Brannon frightened.  See Plaintiffs' Facts,[1] at ¶¶ 53-54.

*Two*, not only did Mr. Finkelstein cease speaking to Dr. Brannon and his partner, Sherrie Bourg Carter, Psy.D., but their referrals from the Public Defender's Office immediately and precipitously decreased as various assistants told Dr. Brannon that the management of the Public Defender's Office was angry at him for having testified in favor of Judge Aleman.  See Plaintiffs' Facts, at ¶¶ 55(b) and (c).

*Three*, although Dr. Brannon's name may have been formally included in the rotation of forensic psychologists whom the Public Defender's Office used, he was intentionally skipped over in a pattern of unspoken revenge ("death by a 1000 invisible cuts") so as to leave Dr. Brannon — in the words of Mr. Finkelstein's July 9 e-mail — "withering on the vine, pinned and wriggling on the wall with no target or issue or martyrdom for him to seek sanctuary."  See Plaintiff's Facts, at ¶ 61.

*Four*, because the "pinned and wriggling" Dr. Brannon gave an answer that the Public Defender's Office did not like when  an assistant asked him during cross-examination in a murder trial, in which Dr. Brannon had been retained by the State Attorney's Office, "Doctor, aren't you having some issues with the Public Defender's Office right now yourself?," Mr. Finkelstein

---

[1]Plaintiffs Michael P. Brannon, Psy.D.; Michael P. Brannon, Psy.D., P.A.; and the Institute for Behavioral Sciences and the Law, LLC's Statement of Facts in Opposition to Defendant's Howard Finkelstein's Motion for Final Summary Judgment or in the Alternative, Motion for Partial Summary Judgment.

and his top lieutenants formally took Dr. Brannon out of its expert rotation, see Defendant's Facts,[2] DE 104-23, at 6-7, ¶¶ 31-32; requested that he abstain from accepting any appointment as a court's expert in competency or sanity evaluations involving public-defender clients, DE 104-20; unsuccessfully sought a ruling from state psychology licensing officials that would prohibit him from doing any such evaluation, see, e.g., DE 104-21 and Brannon Depo, at 242:2-243:9 and Exhibit I.  Most recently the Public Defender's Office has objected to Dr. Brannon's being hired by the State Attorney's Office or allowed as a State expert to observe a court-appointed expert's examination of a public-defender client.  See Plaintiff's Facts, at ¶ 56.

**Point 2:**     **Plaintiffs have indeed suffered real injury.**

Defendant's argument appears to be that the reduction in plaintiffs' income is a result of nothing other than smaller-than-before state appropriations.  Defendant's Motion, at 4-6.  That is sophistry that is presented in a historical vacuum.  It also is supported by citation to no authority.[3]

---

[2]Defendant's Statement of Undisputed Facts in Support of Motion for Summary Judgment, DE 104-23.

[3]To whatever extent defendant seeks to rely on Farrow v. West, 320 F.3d 1235, 1249 (11th Cir. 2003), which is cited in another portion of its motion ("Third Prong — Causal Relationship," at 7-9) but refers back to the budget-based theory, the case is totally inapposite:  if affirmed summary judgment for a prison nurse whom an inmate accused of retaliating against him for complaints of which no evidence showed that she was aware he had made.  In
(continued...)

Article V of the Florida Constitution was amended in 1998 by the addition of § 14, which called for statewide funding of the court system and went into effect July 1, 2004, see Art. XII, § 25, FLA. CONST. — six months before Mr. Finkelstein became Public Defender.

According to defendant's own numbers, plaintiffs received $524,706.25 from the Public Defender's Office for the July 2005-June 2006 fiscal year and $608,757.50 for the 2006-2007 fiscal year, see DE 104-23, at 2, ¶¶ 6-7 — which after the July 1, 2004 effective date of the statewide-funding amendment.

Meanwhile, the July 9 e-mail exchange between Mr. Finkelstein and his executive chief assistant — "Are you trying to make me ill?"; "no.  him....," Plaintiff's Facts, at ¶ 61 — leaves little doubt that the decrease in plaintiff's income was the result of a lot more than statewide funding for Florida's courts.

Likewise, the adverse action that plaintiff's suffered because of Mr. Finkelstein's vengeful angst is evidenced by such things as the timing of the drop-off in Dr. Brannon's referrals, see Plaintiff's Facts, at ¶ 55(b); the acknowledgment by Melissa McNeil, an assistant public defender, that she was not allowed to hire Dr. Brannon's partner, Sherrie Bourg Carter, Psy.D., on a case involving Dr. Bourg Carter's specialty (a child witness), see id. at ¶

---

[3](...continued)
the case at bar, Mr. Finkelstein was quite aware of Dr. Brannon's testimony, as evidenced by both the testimony of Mr. Gottlieb and by Mr. Finkelstein's own admission.

55(d); and the number of assistants who told Dr. Brannon that they wished to hire him, but were being discouraged by an office management that was angry at him. See id. at ¶ 55(c).

Plaintiff additionally has suffered the loss of referrals from criminal judges,[4] to which referrals the Public Defender's Office objects if the defendant is one of its clients, and had to defend himself against the Public Defender's Office's attack on him before the Department of Health.

The smaller budgetary pie to which the defendant refers might impact the amount of damages that the plaintiffs could collect — but for the 11th Amendment precluding damages against Mr. Finkelstein in his official capacity, and Judge Jordan's having ruled that the claims that the Office of the Public Defender's having ceased hiring Dr. Brannon as an expert in its cases was covered by qualified immunity.  It does not, however, destroy the causal connection between Dr. Brannon's protected speech and harm that he has suffered.

**Point 3:      The plaintiffs' loss of business was directly caused by Howard Finkelstein's retaliation.**

Were there any doubt about the causation of the decline in plaintiff's referrals from the Public Defender's Office, that is, were Mr. Finkelstein's angry statement to Michael Gottlieb about "can you believe" that Dr. Brannon had testified in favor of Judge Aleman not enough — a statement that were

---

[4]Plaintiff withdraws his claim that Mr. Finkelstein engineered the creation by former Chief Judge Victor Tobin of a rotation for expert witnesses.

sufficiently upsetting to Mr. Gottlieb that he hurriedly telephoned Dr. Brannon, which was followed by a face-to-face conversation that Dr. Brannon testified left Dr. Brannon frightened of discrimination, a statement that was followed by an immediate drop-off in referrals from the Public Defender's Office, a statement that was followed by assistant public defenders' telling Dr. Brannon that the office was angry at him and that they were being discouraged to hire him, a statement that was followed by another assistant telling Dr. Brannon's partner that she had been ordered hot to hire her notwithstanding her speciality — there is the "death by 1000 invisible cuts" e-mail.

What is so damning about the e-mail is not only its boisterous intemperance, but the context:  here is the public defender, assuring Dr. Brannon that he is, indeed, part of the rotation for expert witnesses — while winking at his top lieutenant, assuring her that it is not so, but also celebrating that not only is the office going to cause Dr. Brannon to die "a death of 1000 invisible cuts," but is going to do so in a way that leaves him "withering on the vine, pinned and wriggling on the wall with no target or issue or martyrdom for him to seek sanctuary."[5]

_____

[5]The sum of plaintiff's evidence distinguishes the case at bar from Martinez v. Minnis, 257 Fed. Appx. 261, 266 (11th Cir. 2007), a case brought by a pro se federal inmate.

Although one can hardly argue with the broad legal statements for which defendant cites its various authorities,[6] those citations simply do not apply to the facts of this case.  In <u>Castle v. Appalachian Tech. College</u>, 631 F.3d 1194, 1197 (11th Cir. 2011) (involving the suspension of a disruptive, bullying nursing student) and <u>Smith v. Mosley</u>, 532 F.3d 1270, 1279 (11th Cir. 2008) (dealing with prison discipline meted out to an inmate who couched his complaints in a letter containing untrue statements and steeped in insubordination), the courts held that of course each government actor was justified in doing what it had done, notwithstanding that the plaintiff had attempted to cloak misbehavior in a patina of some constitutionally protected activity.

Although a tightening budget and an innocent desire to switch to a rotation system for selecting experts might have legitimately have caused the plaintiff's income to decrease somewhat subsequent to Dr. Brannon testimony in favor of Judge Aleman, whether it actually did is a question of fact to be resolved by a jury:  the confluence of events gives rise to a temporal proximity from which reasonable jurors could infer causation.  <u>See, e.g.</u>, <u>Stanley v. City of Dalton</u>, 219 F.3d 1280, 1291, n. 20 (11th Cir. 2000)

---

[6]Generally, the defendant relies on several Eleventh Circuit cases that in turn rely on the central teaching of <u>Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 287 (1977), which is that after a plaintiff demonstrates that his or her engaging in constitutionally protected activity was a substantial, motivating factor that caused him or her to suffer an adverse action, a government actor can escape liability by proving that it would have taken the same action regardless of the constitutionally protected behavior.

(cataloguing factors courts may use to determine is constitutionally protected behavior is a substantial cause of adverse action).[7]  The vitriolic tone in Mr. Finkelstein's July 9, 2009 e-mail provides evidence from which jurors might reasonably determine that his explanations are pretextual.  See, e.g., Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 147 (2000), quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, at 511 (1993):

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination.

---

[7]The court noted that "[i]n conducting this examination in the past, we considered several factors as relevant. We concluded that 'where termination closely follows protected activity, it is usually reasonable to infer that the activity was the cause of the adverse employment decision.'" Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 745 (11th Cir. 1996).... Further, we examined any comments made, or actions taken, by the employer indicating that the discharge was related to the protected speech. See [Fikes v. City of Daphne, 79 F.3d 1079, 1084 (11th Cir. Ala. 1996)] (noting the police chief's statement that he wanted the plaintiff out of the department); [Stewart v. Baldwin County Bd. of Educ., 908 F.2d 1499, 1507 (11th Cir. 1990)] (noting comments indicating the speech was a factor in the termination decision); Morro v. City of Birmingham, 117 F.3d 508, 516 (11th Cir. 1997); [Beckwith v. City of Daytona Beach Shores, 58 F.3d 1554, 1565 (11th Cir. Fla. 1995)]; Schneider v. Indian River Community College Found., Inc., 875 F.2d 1537, 1543 (11th Cir. 1989).... Finally, we considered circumstantial evidence of causation including such facts as who initiated any internal investigations or termination proceedings, whether there was any evidence of management hostility to the speech in question, or whether the employer had a motive to retaliate. See Beckwith, 58 F.3d at 1564-65. There is no one factor that is outcome determinative, but all factors must be taken into account.

**Point 4:     Dr. Brannon's <u>State v. Joseph</u> testimony does not disqualify him as an expert.**

Mr. Finkelstein argues that post-July 2009 — the month during which, ***One***, Mr. Finkelstein wrote the "death by 1000 invisible cuts" e-mail and, ***Two***, one of his assistants asked Dr. Brannon, who was under oath at the time, "Doctor, aren't you having some issues with the Public Defender's Office right now yourself?," and got back a truthful answer — he has been acting solely as a lawyer, trying to protect his clients, and not as an administrator whose actions are under color of state law.

However, the evidence — e.g., his comments to Michael Gottlieb, and his "death of 1000 invisible cuts" e-mail to his top lieutenant — makes clear that Mr. Finkelstein has been operating throughout as an vengeful administrator — not as a trial lawyer representing clients. Mr. Finkelstein's motivation as to Dr. Brannon is angst-driven and far outside of any concern for any client. Indeed, given Dr. Brannon's reputation and popularity amongst Mr. Finkelstein's assistants, not using him could even be said to be against the interest of his clients.

While the answer on cross-examination in <u>State v. Joseph</u> may not have been one that either the assistant public defender or the office's management liked, it was neither untrue (especially since Dr. Brannon was under oath) nor discourteous. <u>See</u> DE 104-14, at 8-14 (Transcript pp. 131:6-135:9). Likewise, the fact that Lynne DeSanti, an assistant public defender, picked a hallway argument with Dr. Brannon on a Christmas Eve (if one

accepts the version of events contained in Dr. Brannon's deposition), hardly provides any basis for thinking that Dr. Brannon would do anything to harm any of the clients of the Public Defender's Office.

Lawyers who are simply trying to protect their clients' rights (even if they are being paid by the state to do so) occupy a protected sphere in which it has been held that "a public defender does not act under color of state law when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding. " Polk County v. Dodson, 454 U.S. 312, 325 (1981) (affirming trial court's dismissal of a suit brought pursuant to 42 U.S.C. § 1983 against a public defender by a former client who alleged that she represented him inadequately before a state supreme court).  However, "state public defenders are not immune from liability under § 1983 for intentional misconduct, 'under color of' state law," Tower v. Glover, 467 U.S. 914, 916, 923 (1984) (public defenders alleged to have conspired with state actors to deprive one of their clients of his constitutional rights).  "[T]he determination whether a public defender is a state actor for a particular purpose depends on the nature and context of the function he is performing." Georgia v. McCollum, 505 U.S. 42, 54 (1992) (defense attorney engaging in racially biased jury selection is a state actor operating under color of state law).

One of those functions held to be not immune to suit is hiring. Therefore, notwithstanding "the personal and confidential nature of the attorney-client relationship," Osman v. Hialeah Housing Authority, 785 F.2d

1550 (11th Cir. 1986) (holding that attorney for a public body has no property right in his employment), notwithstanding that two Republican assistant public defenders in Rockland County, NY, "had broad responsibilities with respect to particular cases that were assigned to them," Branti v. Finkel, 445 U.S. 507, 511 (1980), and further notwithstanding the "confidential character of respondents' work ," id., the Supreme Court affirmed a § 1983 injunction forbidding the Democratic public defender from firing them because of their political affiliation.  Id.

Further illustrative of ways in which a public defender and his office can be a proper § 1983 defendant is the decision in the case of a former capital-murder defendant who complained that two administrative decisions by the Clark County, Nevada, public defender resulted in the former client spending 14 years in prison because of what a state collateral-review court held was ineffective assistance of counsel.   Miranda v. Clark County, 319 F.3d 465 (9th Cir.) (en banc), cert. denied, 540 U.S. 814 (2003).   The first of those decisions was an alleged policy to limit the investigative and legal resources devoted to any clients who failed a polygraph exam concerning his version of what happened — which the court held could constitute "a policy of deliberate indifference to the requirement that every criminal defendant receive adequate representation, regardless of innocence or guilt." Id. at 469-470. The second was the non-training policy that resulted in the client's case being assigned to a lawyer with no capital-murder experience and only a little over a year's experience after law school.  Id. at 468, 471.  See also Woods v.

<u>Brunswick Circuit Dist. Attorney's Office</u>, Slip Op., Case No. CV209-129, 2010 U.S. Dist. LEXIS 13432 (S.D. Ga. Feb. 17, 2010)(denying to dismiss on frivolity grounds a <u>pro se</u> complaint against Brunswick County public defender's office, which allegedly did nothing whatsoever for one arrestee because of budgetary constraints, although it represented his co-defendant).

In the case at bar, Mr. Finkelstein's continuing — and even escalating — mission against Dr. Brannon because Dr. Brannon testified before the Judicial Qualifications Commission for a judge whom Mr. Finkelstein deemed an "evil witch" is behavior that takes Mr. Finkelstein out of the role of a criminal defense lawyer and puts him into the category of someone bent on using his state-actor power to inflict intentional harm.

**Point 5:     Mr. Finkelstein is not entitled to qualified immunity.**

"[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).

This Court's predecessor determined at the motion-to-dismiss stage that qualified immunity would protect Mr. Finklestein from liability for damages for his refusal to hire Dr. Brannon as an expert, since hiring experts is within Mr. Finkelstein's discretionary authority as Public Defender and the Court did not consider the law against what Mr. Finkelstein had done to have been "clearly established."

Defendant, however, argues — without any authority on point — that it is also within Mr. Finkelstein's authority to dictate whom the State Attorney's Office may hire and whom the judges of Broward County's state court may appoint as experts.  That is incorrect.  Nor was it part of Mr. Finkelstein's discretionary authority to direct his office to seek a ruling from the Department of Health that would prohibit Dr. Brannon to accept court appointments on defendants that were represented by the Office of the Public Defender.

Thus, Mr. Finkelstein's efforts to expand his crusade to inflict upon Dr. Brannon a "death of 1000 invisible cuts" is not something for which he can escape personal liability when he ventures beyond his discretionary authority to hire experts for the Office of the Public Defender.

**Point 6:**    **Plaintiffs are entitled to injunctive relief.**

The first flaw in defendant's argument against injunctive relief is that it is premised on a case, <u>Gold Coast Publications, Inc. v. Corrigan</u>, 42 F.3d 1336 (11th Cir. 2004), which sets out the requirements for ***preliminary*** injunctive relief, not permanent.  <u>See</u> 42 F.3d at 1343.

Second, it assumes that this Court is powerless to stop Mr. Finkelstein, either personally or in his official position as Public Defender for Broward County, of continuing to pursue his "death of 1000 invisible cuts" strategy on a forensic psychologist who had the temerity to testify truthfully (as opposed to following Mr. Finkelstein's script) when subpoenaed to a disciplinary hearing before the Judicial Qualifications Commission.

What Dr. Brannon and his two business entities need to be stopped is such behaviors as Mr. Finkelstein's:

• objecting to the State Attorney's Office's hiring Dr. Brannon as an expert;

• refusing to hire Dr. Bourg Carter of Dr. Butts because they are business associates of Dr. Brannon;

• objecting to the State Attorney's Office's hiring Dr. Brannon, or impeding his ability to work on State cases (e.g., by objecting to his observing court-appointed experts examinations);

• complaining to such agencies as the Department of Health concerning Dr. Brannon; and

• maintaining an office-wide prohibition against any of the assistant public defenders — each of whom has a professional-responsibility obligation to use independent judgment on behalf of his or her individual clients[8] — against the employment of Dr. Brannon as an expert.

Those matters, however, are things that would best be dealt with post-trial rather than on motion for summary judgment.

---

[8] See, e.g., Florida Bar Rule of Professional Responsibility 4-5.4(d) ("Exercise of Independent Professional Judgment. — A lawyer shall not permit a person who recommends, employs, or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services.")

**Conclusion**

Based on the authorities cited and the arguments presented, plaintiffs respectfully request this Court to deny defendant Howard Finkelstein's motion for summary judgment or partial summary judgment.

Respectfully Submitted,

*/§     William R. Amlong*
WILLIAM R. AMLONG
Florida Bar No: 470228
WRAmlong@TheAmlongFirm.com
KAREN COOLMAN AMLONG
Florida Bar No. 275565
KAmlong@TheAmlongFirm.com
AMLONG & AMLONG, P.A.
500 Northeast Fourth Street
Fort Lauderdale, Florida 33301-1154
(954) 462-1983/ (954) 463-5008 (fax)

***Attorneys for Plaintiffs***

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been electronically filed with the United States District Court for the Southern District of Florida and thereby electronically transmitted to counsel of record this <u>15th</u> day of August, 2012.

/§ *William R. Amlong*
WILLIAM R. AMLONG

**Service List:**

WILLIAM R. AMLONG
Florida Bar No. 470228
WRAmlong@TheAmlongFirm.com
KAREN COOLMAN AMLONG
Florida Bar No: 275565
KAmlong@TheAmlongFirm.com

AMLONG & AMLONG, P.A.
500 Northeast Fourth Street
Fort Lauderdale, Florida 33301
(954)462-1983

***Counsel for Plaintiffs***

ALICIA L. LAUFER
Florida Bar No. 414336
alaufer@lauferlawyers.com
COREY S. Laufer
Florida Bar No. 174165
claufer@lauferlawyers.com
JENNIFER L. ELLERKAMP
Florida Bar No. 91411
jellerkamp@lauferlawyers.com

LAUFER & LAUFER, P.A.
2200 NW Corporate Blvd Ste 404
Boca Raton, Florida 334317369
(561) 300-5150

***Counsel for Defendants***