**CLOSED CIVIL CASE**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 10-CIV-61813-GRAHAM/O'SULLIVAN

MICHAEL P. BRANNON, Psy.D.,
individually, MICHAEL P. BRANNON,
Psy.D., P.A., a Florida
professional services corporation,
and INSTITUTE FOR BEHAVIORAL
SCIENCES AND THE LAW, LLC,
a Florida limited liability
company,

    Plaintiff,

vs.

HOWARD FINKELSTEIN, in his
official capacity as Broward
County Public Defender,

    Defendant.
_____/

## ORDER GRANTING SUMMARY JUDGMENT

**THIS CAUSE** comes before the Court upon Defendant Howard Finkelstein's Motion for Final Summary Judgment or in the Alternative, Motion for Partial Summary Judgment. [D.E. 104].

**THE COURT** has considered the Motion, the pertinent portions of the record, and is otherwise fully advised in the premises.

### I. FACTUAL BACKGROUND

This is an action for speech retaliation pursuant to 42 U.S.C. § 1983 in violation of the First Amendment to the United States Constitution brought by the plaintiffs, Michael P. Brannon ("Brannon"), Michael Brannon, Psy.D., P.A., and the Institute for

Behavioral Sciences and the Law, LLC ("IBSL"). Brannon is a forensic psychologist and sole owner of Michael P. Brannon, P.A. Michael P. Brannon, P.A. owns fifty percent of the IBSL. Brannon's partner, Sherrie Bourg Carter ("Carter") receives fifty percent of the IBSL's income. Plaintiffs allege that because of retaliation they suffered a loss of income based on reduced referrals from the Broward County Public Defender's Office. Defendant, Howard Finkelstein ("Finkelstein")has been the Public Defender for the 17th Judicial Circuit in and for Broward County Florida since 2005.

As a result of a statewide focus on judicial branch costs, the 2004 enactment of Article V to the Florida Constitution, the subsequent economic turndown and resulting cuts to agency budgets, the Broward County Public Defender's Office ("P.D.") began researching ways to reduce expenses. There were two classifications of expenses which proved to be of concern, Special Public Defender costs and due process expenses. Numerous changes in procedures were implemented including the drastic reduction of the P.D.'s budget for mental health experts between 2007 and 2010.

On March 23, 2006, the P.D. implemented the first of many procedures aimed at controlling expenses by requiring supervisor approval for retention of any expert by an Assistant Public Defender ("APD"). Also, after it was determined that the P.D. Office was one of the only Public Defenders' offices statewide that used expert testimony for all downward departures, the P.D. changed

the way experts were used in downward departures, by training their attorneys on how to achieve a downward departure without having to hire a psychologist.

In the fiscal year 2005-2006, which extended from July 1, 2005 through June 30, 2006, the P.D. expended $1,860,619.46 on mental health experts, of which $271,950.00 were spent on downward departures. Plaintiffs were paid $524,706.25 or 28.2% of all due process expert fees from the P.D. in 2005-2006. In the fiscal year 2006-2007, which extended from July 1, 2006 through June 30, 2007, the P.D. expended $1,943,544.28 on mental health experts, of which $334,531.00 were spent on downward departures. Plaintiffs were paid $608,757.50 or 31.32% of all due process expert fees from the P.D. in 2006-2007. In the fiscal year 2007-2008, which extended from July 1, 2007 through June 30, 2008, the P.D. expended $1,333,635.49 on mental health experts, of which $188,826.00 were spent on downward departures. Plaintiffs were paid $390,212.00 or 29.26% of all due process expert fees from the P.D. in 2007-2008.

On December 6, 2007, Brannon testified before the Judicial Qualifications Committee ("JQC") on behalf of Judge Cheryl Aleman. Within a week to one month after the JQC hearing, Michael Gottlieb, a private criminal defense attorney that had an attorney-client relationship with Brannon, had a conversation with Finkelstein during which Finkelstein expressed his dissatisfaction over Brannon's testimony on behalf of Judge Aleman. Finkelstein told

Gottlieb that he was "surprised, extremely disappointed" about Brannon's testimony. Gottlieb and Finkelstein did not discuss the P.D.'s use of Brannon as an expert.

Following his conversation with Finkelstein, Gottlieb called Brannon to let him know about his conversation with Finkelstein. After hearing what Finkelstein told Gottlieb, Brannon believed he was being or going to be discriminated against.

In fiscal year 2008-2009, after Brannon's testimony before the JQC, which extended from July 1, 2008, through June 30, 2009, the P.D. expended $562,091.00 on due process experts, of which $31,262.00 were spent on downward departures. Plaintiffs received $170,612.00 or 30.35% of the total budget for due process mental health experts for 2008-2009.

As of March 1, 2009, the P.D. began utilizing an internal wheel rotation for the retention of mental health experts. The wheel rotation for the retention of mental health experts was implemented in an effort to control and reduce expenses as well as to diversify the pool of experts available for retention by P.D. attorneys on behalf of their clients. Brannon was included on the internal wheel rotation for the retention of experts.

Brannon and his partner Carter objected to the use of a wheel rotation system for the retention of experts. According to Brannon, the wheel rotation was an unfair system that reinforced mediocrity. Specifically, Brannon asserted that the wheel rotation was a

horrific idea, and he expressed his opinions regarding the wheel rotation to everyone who would listen. Brannon also expressed his displeasure with regard to each of the steps taken by the P.D.'s office aimed at cost-containment, reducing expenses and broadening the pool of expert witnesses.

On July 7, 2009, Finkelstein assured Brannon in an email that Brannon was on the wheel rotation. He then emailed one of his assistants, Catherine Keuthan, and wrote that Brannon would die a "death by a 1000 invisible cuts." Also, in July, 2009, during Brannon's cross examination by Assistant Public Defender George Reres in the case of State of Florida v. Bernard Joseph, Brannon discussed issues he was having with the P.D., including his displeasure and disagreement with the implementation of the wheel rotation for retaining experts. On or about July 28, 2009, after reviewing Brannon's testimony in the Joseph case, Finkelstein and Chief Assistant Public Defender Robert Wills determined that the P.D. could no longer retain Brannon to evaluate the P.D.'s clients, and removed Brannon from the P.D.'s wheel rotation. According to Finkelstein, Brannon's testimony in the Joseph case, precipitated the P.D.'s decision to no longer use Brannon as an expert. Prior to July 28, 2009, no decision had been made not to utilize Brannon as an expert. As a result, Brannon received $12,800.00 or 2.83% of the total expenses for experts of the P.D. for fiscal year 2009-2010, which extended from July 1, 2009 through June 30, 2010.

Additionally, in March, 2010, Brannon testified in <u>State of Florida v. Patrick Young</u> about his disputes with the P.D. When asked how he felt about the Public Defender's office not wanting to work with him Brannon responded:

> Well, it made me proud. And the reason why is because their dispute was with my honesty. They didn't like that sometimes I said people weren't being honest and straightforward, they wanted their own congeries of experts to call things the way they wanted them to. So I felt it was kind of a backhanded compliment. So I felt proud of that and was able to pick up that work in other areas. So actually, I was kind of patted on the back by that.

[D.E. 104, Exhibit Q p.62 L14-24].

On July 28, 2010, Finkelstein, the two Executive Chief Assistant Public Defenders and the eight Chief Assistant Public Defenders requested that Brannon refuse to accept court appointed evaluations involving P.D. clients. The P.D. objected to Brannon's appointment by criminal division judges and hiring by the State Attorney's Office ("SAO") in cases that involve P.D. clients. As a result of Dr. Brannon's continued animosity towards the P.D., and the filing of the instant lawsuit, it was perceived that there was a conflict of interest in Brannon's continuing to accept court appointments involving the P.D. clients. The P.D. filed a complaint with the Florida Department of Health when Brannon continued to accept court appointments involving P.D. clients after he filed the instant litigation on September, 29, 2010.

6

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper where the pleadings and supporting materials show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the case, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), and a dispute of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Marine Coatings of Ala., Inc. v. United States, 932 F.2d 1370, 1375 (11th Cir. 1991).

The Court must draw all inferences from the evidence in the light most favorable to the non-moving party and resolve all reasonable doubts in that party's favor. Porter v. Ray, 461 F.3d 1315, 1320 (11th Cir. 2006). The burden of establishing the absence of a genuine issue of material fact rests on the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

When the moving party has met this burden by offering sufficient evidence to support the motion, the party opposing the motion must then respond by attempting to establish a genuine issue of material fact. Adickes v. S.H. Kress & Co., 398 U.S. 144, 160, 90 S. Ct. 1598, 26, L. Ed. 2d 142 (1970). "[T]he nonmoving party 'must do more than simply show there is some metaphysical doubt as

to the material facts.'" Ray v. Equifax Info. Servs., L.L.C., 327 F. App'x 819, 825 (11th Cir. 2009)(quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof." Id. Indeed, "there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990). If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." Anderson, 477 U.S. at 249-50.

### III. DISCUSSION

In order to prevail under a speech retaliation claim under 42 U.S.C. § 1983, a plaintiff must prove: 1)his speech was constitutionally protected; 2)he suffered adverse conduct that would likely deter a person of ordinary firmness from engaging in such speech; and 3) there is a causal relationship between the protected speech and the adverse conduct. See Castle v. Appalachian Technical Coll., 631 F.3d 1194, 1197 (11th Cir. 2011)(citing Bennett v. Hendrix, 423 F.3d 1247, 1250 (11th Cir. 2005).

**A. Constitutionally Protected Speech**

Finkelstein does not dispute that Brannon's testimony on behalf of Judge Cheryl Aleman is constitutionally protected. Accordingly, this Court finds Brannon's testimony to be

constitutionally protected speech.

### B. Adverse Conduct

Plaintiffs argue Brannon experienced adverse conduct stemming from Finkelstein. In support, Plaintiffs present the yearly decline in the dollar amount received from the P.D. for Brannon's expert testimony as a mental health expert. Brannon received $524,706.25 in expert fees in the fiscal year 2005-2006; $608,757.50 in 2006-2007; $390,212.00 in 2007-2008; $170,612.00 in 2008-2009; and 12,800.00 in 2009-2010.

Plaintiffs are correct in that the dollar amount Brannon was paid dwindled to only a fraction of what he once earned. However, Finkelstein correctly asserts that the amount received by Brannon as a percentage of the P.D.'s overall budget for due process experts is essentially the same from fiscal year 2005-2006 to fiscal year 2008-2009. Thus, a decrease in the dollar amount is not a proper gauge in determining whether Brannon was the target of adverse conduct by Finkelstein. It is undisputed that Brannon received a consistent percentage of the P.D.'s total budget even after testifying before the JQC. Additionally, Finkelstein has presented evidence showing that the P.D. decreased the amount used on experts in downward departures in an attempt to decrease expenditures for the overall budget. Alternatively, the Plaintiffs have failed to present evidence that the decrease in the dollar amount received was solely aimed at Brannon. Therefore, without

9

such evidence, the decrease in dollar amount received cannot be found to be adverse conduct on behalf of Finkelstein toward Brannon.

However, Brannon's removal from the expert witness wheel rotation suffices in creating a triable issue regarding whether adverse conduct took place. The removal resulted in Brannon receiving $12,800.00, or only 2.83% of the P.D.'s budget in fiscal year 2009-2010. Finkelstein's and his colleagues' decision to remove Brannon from the wheel rotation creates an issue as to whether there exist adverse conduct that would likely deter a person of ordinary firmness from engaging in the speech protected by the United States Constitution. Castle, 631 F.3d at 1197. A reasonable jury could find that losing all of the P.D.'s business, from which Brannon earned over half a million dollars a year at one point, would likely deter a person of ordinary firmness from engaging in the kind of speech at issue.

Likewise, the P.D.'s objections to Brannon's appointment by criminal division judges and hiring by the SAO can reasonably be found to be adverse conduct, regardless of the P.D.'s reasons for doing so.

**C. Causal Relationship**

Plaintiffs fail to present any substantial evidence from which a jury could reasonably find a causal link between the adverse conduct and the protected speech. "In order to establish a causal

connection, the plaintiff must show that the defendant was subjectively motivated to take the adverse action because of the protected speech." Castle, 631 F.3d at 1197 (citing Smith v. Mosley, 532 F.3d 1270, 1278 (11th Cir. 2008)). If the plaintiff shows the adverse conduct was motivated by the speech, the burden shifts to the defendant to show that they would have taken the adverse action in the absence of the protected speech. Id.

First, Plaintiffs point to a conversation between Finkelstein and Gottlieb following Brannon's testimony at the JQC hearing. Finkelstein told Gottlieb he was surprised and disappointed by Brannon's testimony. However, Finkelstein and Gottlieb did not discuss any plans or any desire by Finkelstein to curtail Brannon's use as an expert by the P.D. Gottlieb did not recall any expression by Finkelstein of seeking retaliation against Brannon. Only after speaking with Gottlieb about the conversation with Finkelstein did Brannon believe he was going to be discriminated against. However, without any expression of a desire or plan to retaliate, the content of the conversation between Gottlieb and Finkelstein does not show motivation.

Additionally, a reasonable jury could not find the conversation to be a causal link, given the date of the Gottlieb and Finkelstein conversation in relation to the adverse conduct. The conversation between Finkelstein and Gottlieb occurred shortly after the JQC hearing, and Brannon was removed from the expert

11

wheel rotation over nineteen months after Brannon's testimony. Moreover, the P.D. retained Brannon as an expert consistently and proportionately to the P.D.'s budget at all times after the conversation until Brannon's removal from the wheel rotation.

While Brannon recalls that various assistant public defenders told him that the P.D.'s office was angry with him for testifying at the JQC hearing, the Court finds the statements to be inadmissible hearsay. Although Brannon can recall the names of the assistant public defenders, he has no recollection of any one of the conversations he had with any of the assistants.

Also, the email in which Finkelstein wrote that Brannon will die a "death by 1000 invisible cuts" does not link Brannon's protected speech to the adverse conduct. While the email may show that Finkelstein had some animosity toward Brannon, it does not link Brannon's removal from the wheel rotation to Brannon's testimony at the JQC hearing nineteen months prior.

Even assuming the email is sufficient to establish a retaliatory motive, Finkelstein has presented sufficient evidence to show he would have taken the adverse action regardless of Brannon's constitutionally protected testimony. See Castle, 631 F.3d at 1197. Brannon admitted he had taken issue with the P.D.'s implementation of a wheel rotation. He expressed his dislike of the wheel rotation system to anyone who would listen. Nonetheless, Brannon was still on the wheel rotation of experts and was taken

12

off the rotation only after expressing his opinion regarding the P.D.'s policies during Brannon's cross examination in <u>State of Fla. V. Bernard Joseph</u>.

Moreover, Finkelstein has produced evidence showing Brannon was treated in a consistent manner from the time of the protected speech until the time of Brannon's removal. With the consistent treatment and lack of any evidence of adverse conduct during the nineteen months prior to Brannon's removal, the Court does not find the email sufficient evidence of motivation stemming from the JQC hearing testimony.

Lastly, the P.D. requested that Brannon not accept court appointed evaluations involving P.D. clients, and objected to Brannon's appointment by the court and hiring by the SAO when the P.D.'s clients were involved. There is no evidence that these actions were motivated by Brannon's constitutionally protected speech. Rather, the P.D.'s objections were reasonable considering Brannon's expressed displeasure toward the P.D. and considering the filing of the instant law suit. Because of the potential conflict of interest the objections by the P.D. cannot be reasonably found to be motivated by Brannon's testimony at the JQC hearing.

Plaintiffs have not presented sufficient evidence to reasonably find Finkelstein was motivated by the protected speech, and Finkelstein has shown the adverse conduct would have taken place regardless of Brannon engaging in the protected speech.

Therefore, the Plaintiffs have not met their burden in establishing a triable issue as to a causal link between the protected speech and the adverse conduct.

## IV. CONCLUSION

Based on the foregoing, it is hereby

**ORDERED AND ADJUDGED** that Defendant Howard Finkelstein's Motion for Final Summary Judgment [D.E. 104] is **GRANTED**. Judgment is entered in favor of Defendant Howard Finkelstein and against Plaintiffs. It is further

**ORDERED AND ADJUDGED** that this case is **CLOSED** for administrative purposes and all pending motions are **DENIED** as moot.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 16th day of October, 2012.

*/s/ Donald L. Graham*
DONALD L. GRAHAM
UNITED STATES DISTRICT JUDGE

cc: All Counsel of Record